**E-FILED on** 9|53|4235

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| RAYMOND HOUSTON, | No. C-07-04511 RMW |
| Petitioner, | |
| v. | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
| ROBERT J. HERNANDEZ, Warden, | |
| Respondent. | |

Raymond Houston petitions for a writ of habeas corpus under 28 U.S.C. § 2254. The habeas corpus petition asserts that Raymond[1] is held in custody as a result of his conviction of second degree murder of his estranged wife Lucille Houston in violation of his constitutional rights. For the reasons set forth below, the petition for writ of habeas corpus is DENIED.

---

[1] The court refers to Petitioner Raymond Houston and Lucille Houston by their first names to distinguish them.

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS—No. C-07-04511 RMW
TMDH/SW

# I. BACKGROUND[2]

Lucille, a photojournalist for the San Jose Mercury News, married Raymond in 1998. In June 2001, she moved out of their jointly owned house on Fresno Street in Oakland and filed for divorce. On November 25, 2001, Lucille was found dead in her car, which was parked about 15 minutes' walk from the Fresno Street house.

On November 23, 2001, Lucille's friends contacted the police and Raymond after Lucille had failed to pick up an out-of-town visitor at the airport on November 21, 2001, appear with Raymond at a friend's house on November 22, 2001 for Thanksgiving dinner, or call her family on Thanksgiving or her mother for her mother's birthday.

Raymond met with Lucille's friends and the police on November 23, 2001. In a written statement given the next day, Raymond claimed that Lucille had stayed overnight with him at the Fresno Street house on November 20, 2001, and that she was at the house and alive when he left early the following morning to go to work. The interviewing officer testified at trial that Raymond did not indicate at the time that anyone else had access to the house.

On November 25, 2001, Lucille's body was found under a blue tarp on the back seat of her car parked on a street within about a 15 minute walk from the Fresno Street house. The pathologist who performed an autopsy testified that gunshots to Lucille's abdomen and head killed her. Police recovered a bullet from Lucille's brain, but did not find the bullet that had passed through Lucille's abdomen in the car. Police also found an envelope in the backseat pocket of the driver's area containing an unsigned contract detailing Raymond's transfer of his interest in the Fresno Street house to Lucille. Ownership of the Fresno Street house was a source of contention between Raymond and Lucille. Raymond continued to live there after Lucille moved out, but Lucille was in the process of acquiring full ownership.

Police searched the Fresno Street house again after they found Lucille's body. An investigator noticed a recently plastered area on one wall about 39 inches off the ground behind a

---

[2] This factual background largely taken from the opinion of the California Court of Appeal following Raymond's direct appeal of his conviction is consistent with the facts as described by the parties and in the reporter's transcripts. Op. of Cal. Ct. of Appeal, Ex. A at 1-5 (June 15, 2005), Dkt. No. 2, 130 Cal.App.4th 279 (2005); Pet'r's Br. 5-26; Resp.'s Br. 1-22; Reporter's Transcript (RT) Ex. E, Dkt. Nos. 34-47.

coat rack in the upstairs bedroom of the Fresno Street House. Inside the wall, police found a bullet. An experienced police forensic biologist extracted material from the bullet and found traces of what was almost certainly Lucille's DNA.[3] A police firearms expert conducted an analysis of the bullets recovered from Lucille's brain and from Raymond's bedroom wall and concluded that they were fired from the same gun, a .380 automatic.

Police found other relevant physical evidence in the Fresno Street house. They concluded from their examination of a box spring in Raymond's bedroom that a bullet had passed through it, with the "entry" hole approximately 37 inches and "exit" hole about 39 inches above the ground when the box spring was placed on edge. They also found numerous unidentifiable fingerprints in the house, no blood evidence, cleaning supplies, and a container of joint compound. The police did not find any of Lucille's personal effects at the Fresno Street house (such as her toiletries, cosmetics, clothes, and inhaler), but they did find them in the hotel room where Lucille had been staying.

Raymond was subsequently arrested and charged with murdering Lucille sometime between November 20 and 25, 2001, in violation of Penal Code section 187, and with using a firearm in violation of Penal Code sections 12022.53, subdivisions (c) and (d), 1203.06, subdivision (a)(l) and 12022.5, subdivision (a)(1). Raymond pled not guilty and denied the enhancements.

On October 23, 2003, a jury found Raymond guilty of second degree murder and that he personally used a firearm. On December 12, 2003, he was sentenced to 40 years to life in state prison. Raymond appealed his conviction to the California Supreme Court and then petitioned for habeas relief in state court. He filed a federal habeas petition on August 30, 2007, which the court stayed pending exhaustion of his state remedies. His last state petition was denied on March 17, 2008. On October 27, 2008, Raymond notified the court that his state claims were exhausted and the court issued an order to show cause on November 23, 2009.

Now Raymond seeks habeas relief based on: (1) ineffective assistance of counsel at trial; (2) unconstitutional introduction of testimonial evidence without the witness appearing at trial; (3) unconstitutional introduction of inflammatory character evidence; and (4) unconstitutional introduction of DNA evidence without adequate means of verification.

---

[3] The forensic biologist testified that only one in 635 billion people would be a DNA match.

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS—No. C-07-04511 RMW
TMDH/sw                                                    3

### III. ANALYSIS

Raymond petitions for habeas relief under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, a court may grant a petition for writ of habeas corpus to a person in custody "pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). Further, the court may only provide the requested relief if the state court's ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The review of state court decisions is highly deferential, and federal judges should give those decisions the benefit of the doubt. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). In the absence of any existing Supreme Court law supporting habeas relief, the claim must be denied. *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

### A. Right to Effective Assistance of Counsel

Raymond argues that he was denied effective assistance of counsel because his trial counsel failed to conduct a thorough investigation in not contacting, interviewing, and calling Don Swall as a witness. Swall has known Raymond since Raymond was his junior high student. Swall Decl., Dkt. No. 2. Swall was social with both Raymond and Lucille. *Id.* Raymond argues that Swall's testimony would have rebutted the prosecution's evidence that Raymond was dissatisfied with the house settlement and presented evidence that Raymond and Lucille were on good terms. *Id.* ¶¶ 8, 18.

A claim of ineffective assistance of counsel is cognizable as a claim for denial of the Sixth Amendment right to counsel, which guarantees effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.* A Sixth Amendment ineffective assistance of counsel claim requires two showings: (1) counsel's performance fell below an

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS—No. C-07-04511 RMW
TMDH/sw                                        4

"objective standard of reasonableness" under prevailing professional norms and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687-88, 694.

Where a state court has rejected an ineffective assistance of counsel claim, a federal court may only grant habeas relief if the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1); *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). This requires a showing that the state court's application was "not only erroneous, but objectively unreasonable." *Id.*

The parties do not dispute that Raymond raised this issue before the California Supreme Court where the petition was summarily denied. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011). In such cases, the court "must determine what arguments or theories . . . could have supported the state court's decision." *Id.* at 786. As long as "'fairminded jurists could disagree' on the correctness of the state court's decision," it must be affirmed. *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has reminded lower courts that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.*

Under the first *Strickland* prong, a court could reasonably have found that defense counsel Tony Serra's decision not to call Swall was tactical. "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Yarborough*, 540 U.S. at 8 (2003) (citing *Strickland*, 466 U.S. at 690). Here, Raymond admits that his counsel was aware of Swall and that he was prepared to testify about Raymond and Lucille's amicable post-split relationship. Pet'r's Br. 26; Swall Decl. ¶¶ 8, 15, Dkt. No. 2. Although Raymond argues that Swall could only have helped his case, the state suggests a number of reasonable tactical justifications for not calling Swall including his likely lack of knowledge about Jessie, who Raymond claimed was Lucille's lover and probable murderer. Swall's declaration does not say anything about Jessie, Swall Decl., and thus, assuming he did not know about Jessie, his likely testimony on cross examination would have undercut Raymond's theory that

Jessie murdered Lucille and called into question how well Swall actually knew Raymond and Lucille. Furthermore, Swall's testimony would not have been that helpful. A number of uninterested witnesses provided strong evidence that the relationship was not always cordial. One witnesses testified that she saw Raymond kick-in Lucille's car window as she fled him after a fight. RT 607-08. Raymond's co-workers testified that they had had conversations with Raymond in which he had expressed that he was unhappy with his and Lucille's proposed settlement over the Fresno street house including commenting that he thought Lucille was trying to "play" or "burn" him. RT 485-86, 571-72, 576. Because the court finds that a reasonable jurist could have concluded that Serra's decision was tactical, there was no constitutional violation for ineffective assistance of counsel.

Furthermore, because the California Supreme Court could have reasonably concluded that Raymond's claim failed under the second *Strickland* prong for failing to establish prejudice, the court cannot grant habeas relief. There was substantial evidence that Raymond was unhappy with the house settlement and strong circumstantial evidence that he was the murderer. The California Court of Appeals found "overwhelming evidence" of guilt including:

> (1) [Raymond] and [Lucille] had separated several months before her death and were in the process of divorcing.
> (2) The two were arguing over the disposition of the Fresno Street house in their divorce, a house which [Raymond] was possessive about and which remained his home.
> (3) [Raymond] and [Lucille] met at the Fresno Street house on the evening of November 20, 2001, and argued bitterly over the house.
> (4) No one other than [Raymond] reported seeing or hearing from [Lucille] after November 20, 2001.
> (5) [Raymond] reported that [] he had moved [Lucille's] car into his garage sometime on the evening of November 20, or in the early morning of November 21, 2001.
> (6) A witness saw [Lucille's] car parked outside the witness's home on [the] street, within walking distance of the Fresno Street house, sometime between 6:30 and 7:00 a.m. on November 21, 2001, where police later discovered it.
> (7) [Lucille's] body was found on November 25, 2001, in the back seat of her car, mutilated by two gunshot wounds and containing a bullet from a .380 automatic, covered by a blue tarp, and an envelope containing real estate documents sent to [Lucille] for [Raymond's] execution was found in the backseat pocket of the driver's area.
> (8) Police subsequently found a bullet inside a concealed, recently plastered area of a wall in [Raymond's] bedroom, as well as a box spring in the bedroom that was damaged in a manner consistent with a bullet passing through it.
> (9) A police firearms expert concluded from an extensive examination of the bullet recovered from [Lucille's] brain and the bullet removed from [Raymond's] bedroom wall that they were fired from the same gun, a .380 automatic.

(10) Police found joint compound and cleaning supplies in the Fresno Street house.
(11) [Raymond] did not report that anything was amiss inside the house before the police discovered the incriminating physical evidence discussed herein, and the house did not show signs of [Lucille] having been there.
(12) [Raymond's] actions and statements in the days after [Lucille's] disappearance were highly suspicious, including that although [he] contended that [Lucille] failed to meet him as planned on November 21 and 22, 2001, he made no corroborated effort to find [Lucille] or tell others that she was missing.
(13) During [Lucille's] disappearance, [Raymond] misled the police about his whereabouts because, as he told a co-worker, he was afraid he would be arrested, and consulted with an attorney before signing a police witness statement, although evidence of a crime had not yet been discovered.
(14) During [Lucille's] disappearance, [Raymond] volunteered abruptly to police that a blue tarp was missing from his backyard.
(15) Prior to [Lucille's] disappearance, [Raymond] told a co-worker that he owned a .380 automatic.
(16) [Raymond] had engaged in violent acts against [Lucille] within months of her death, fighting with her in June 2001 just prior to their separation and kicking in her car window in August 2001.

*Houston*, 130 Cal. App. 4th at 296-97. The court goes on to add that Raymond "did not present anything credible to rebut this incriminating evidence" relying almost exclusively on his own inconsistent testimony. *Id.* at 297-98. Most importantly, Raymond never provided a good explanation for "how a bullet fired from the same gun as the bullet found in [Lucille's] brain, and containing traces of [Lucille's] DNA, made its way into a freshly plastered wall of his own bedroom." *Id.* 298. Based on all of this, the case against Raymond was sufficiently convincing that even with Swall's testimony suggesting a cordial relationship between Raymond and Lucille, the result would have been the same.

### B. Lucille's Statements to Police and Hospital Personnel

Raymond argues that the admission of Lucille's statements in connection with two alleged domestic violence incidents denied Raymond his Sixth and Fourteenth Amendment rights to confront and cross-examine his accusers. Specifically, Raymond takes issue with three reports. One Lucille gave to the police, another she made to medical personnel regarding a June 2001 incident and the third was her citizen crime report given in relation to an August 2001 incident. Pet'r's Br. 27. Under *Crawford v. Washington*, "testimonial statements" are inadmissible unless the witness appears at trial or was unavailable to testify but the defendant had a prior opportunity for cross-examination. 541 U.S. 36, 53-54 (2004). The court of appeals acknowledged this standard,

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS—No. C-07-04511 RMW
TMDH/SW                                7

but decided the issue by finding harmless error under *Chapman v. California*, 386 U.S. 18, 24 (1967). *Houston,* 130 Cal. App. 4th at 295.

In reviewing state court harmless error decisions, federal courts in habeas cases apply the "substantial and injurious effect" standard without regard for the state court's harmlessness determination. *Ayala v. Wong*, 693 F.3d 945, 961 (9th Cir. 2012) (citing *Pulido v. Chrones*, 629 F.3d 1007, 1012 (9th Cir. 2010)). The standard "'subsumes' the 'more liberal' § 2254(d)/Chapman standard." *Id.* at 961 n.14 (citing *Fry v. Pliler*, 551 U.S. 112, 120 (2007)). In applying the standard, the court reviews the record as a whole and only grants relief if "there was a substantial and injurious effect or influence on the verdict" or the court is left in "grave doubt" as to whether there was an effect. *Pulido v. Chrones*, 629 F.3d 1007, 1012 (9th Cir. 2010).

Here, the court finds that admitting the reports did not have a substantial and injurious effect on the jury's verdict. They were not critical to the government's case and were largely cumulative. The police officer that took the report for the June incident testified based upon his own observation that Lucille's hair was torn out and there was blood on her ear, RT 692, and Raymond testified that he and Lucille had had a physical altercation. RT 1038-41. There was an eyewitness to the August event that testified about it at trial. RT 607-08. Thus, much of the evidence contained in the reports was admitted independently of the reports. More importantly, there was substantial evidence besides the reports to support Raymond's conviction. In particular, the concealed bullet in the wall of the Raymond's bedroom with Lucille's blood on it was strong evidence of guilt. As enumerated above, the court of appeals offered 16 pieces of evidence that provided "overwhelming evidence" of Raymond's guilt besides the reports. *Houston,* 130 Cal. App. 4th 296-97. This court agrees with the court of appeals and independently finds that there was no substantial and injurious effect from admitting the reports.

### C. Character Evidence

Raymond also argues that admitting statements by two women with whom Raymond had affairs that Raymond did not tell them he was married violated his constitutional right to a fair trial. He also argues that the prosecution's questions to other witnesses about his other affairs violated his constitutional rights. Raymond claims that this evidence is "inflammatory bad character evidence"

which should have been excluded pursuant to Evidence Code section 352.[4] Relying on *Estelle v. McGuire*, 502 U.S. 62, 70 (1991), Raymond argues that admission of "inflammatory character evidence that is irrelevant is a violation of state and federal due process." Pet'r's Br. 33.

The court of appeals found that the trial court did not abuse its discretion in admitting the evidence because it was relevant for motive and credibility and it was not unduly prejudicial. *Houston*, 130 Cal. App. 4th at 304-07. The court of appeals found that evidence of whether Raymond told the two women that he was married was relevant to the women's credibility as well as Raymond's credibility, which he put at issue in the case. *Id.* Moreover, the court of appeals found no abuse of discretion for allowing in the evidence of Raymond's other affairs because it was relevant to his motive and credibility. *Id.* at 307. In particular, Raymond testified that he had good relations with Lucille in the months before her murder and the admitted evidence was directly relevant to disputing those claims. *See, e.g.,* RT 1036-37. Although the evidence was probably harmful to Raymond's case, it was not unduly prejudicial and was relevant. Therefore, this court does not find that this admission was an unreasonable application of the law. The court of appeals also found no prejudicial error. *Houston*, 130 Cal. App. 4th at 308. The evidence that Raymond lied about the existence of his wife to the two women and the existence of two additional affairs most likely was not viewed as particularly significant. Thus, the court finds that the admission of this evidence did not have a substantial and injurious effect or influence on the verdict.

**D. The Admitted DNA Evidence Did Not Deny Raymond His Right to Due Process and a Fair Trial**

Raymond argues that the government violated his constitutional rights by extracting DNA evidence from the bullet in his wall in such a way that he was unable to independently determine the reliability of the extraction process. Because the government failed to preserve this evidence, Raymond argues that the DNA evidence should not have been admitted. Law enforcement has a duty under the due process clause to preserve evidence that "might be expected to play a significant

---

[4] "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Cal. Evid. Code § 352.

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS—No. C-07-04511 RMW
TMDH/sw                                   9

role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 488 (1984). A constitutional due process violation for failure to preserve evidentiary material, however, requires a showing by Raymond that the police acted in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

The court of appeals considered the proper Supreme Court standard. *See Houston*, 130 Cal. App. 4th at 302 (quoting *People v. Roybal*, 19 Cal. 4th 481, 509-510, which quoted *Arizona v. Youngblood*). It found that the trial court's decision was based upon substantial evidence and did not find any evidence of bad faith. *Id.* at 402-04. The trial court held a special pre-trial hearing on the matter and considered testimony from the examining forensic biologist who explained that there was no reasonable way for the government to have extracted the DNA from the bullet and still leave DNA for Raymond to extract. *Houston*, 130 Cal. App. 4th at 302-03. At trial, Raymond countered with a letter from a DNA expert stating that it would have been better not to have extracted all of the DNA so that Raymond could verify the extraction, but Raymond failed to adequately explain how failing to preserve DNA for independent extraction was done in bad faith or explain how the DNA could have been extracted so as to allow independent testing by Raymond. *See* Ptr.'s Br. 33; *Houston*, 130 Cal. App. 4th at 302-03; Clerk's Transcript 409, Dkt. No. 32. Because the court of appeals' decision was not an unreasonable application of the law, the court denies relief.

### III. CERTIFICATE OF APPEALABILITY

For the reasons discussed above, the court finds that Raymond has not shown that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, [or] that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Therefore, a certificate of appealability is DENIED.

## IV. ORDER

For the foregoing reasons, the petition for writ of habeas corpus is denied, and a certificate of appealability will not be issued.

DATED: July 31, 2013

*Ronald M. Whyte*

RONALD M. WHYTE
United States District Judge